**GIANNA ENTERPRISES, a New Jersey Corporation, for itself and on behalf of all other franchisees of the Miss World-America Pageant, and on behalf of all the state contest winners of the Miss World-America Pageant, Plaintiffs,**

v.

**MISS WORLD (JERSEY) LTD., Miss World (UK) Ltd., Miss World-America Pageant, World-Wide Pageant Corporation, Eric D. Morley, Mark H. Fleischman, Miss Universe, Inc., Gulf and Western Industries, Inc., and Harold Glasser, Defendants.**

No. 81 Civ. 8121.

United States District Court,
S.D. New York.

Dec. 6, 1982.

**1352**

Abraham Wax, P.C., New York City, for plaintiffs.

Davis & Gilbert, New York City, for Miss World; Howard Peck, New York City, of counsel.

Parker, Auspitz, Neesemann & Delehanty, New York City, for Miss Universe; John M. Delehanty, New York City, of counsel.

SOFAER, District Judge:

Until 1981, two international beauty pageant systems held national beauty contests in the United States. The most well-known of the two, the Miss Universe contest, continues today as it did then, choosing its winner from among the winners of statewide contests, and sending her to compete in the international Miss Universe competition. The Miss World pageant used to work in much the same way. Miss World (U.K.), Miss World (Jersey) Ltd., and Eric Morley, owners of the Miss World competition, would franchise an American company to procure, in accordance with certain prescribed rules and regulations, a contestant for the international competition. The American franchisee, in turn, would assign to state franchisees the right to run state Miss World contests, and would then conduct a national competition among the state contest winners in order to choose Miss World (U.S.A.), who would enter the Miss World contest in London as this nation's contestant against the representatives of other nations.

In 1980, the Miss World owners sold the rights to operate the Miss World pageant in America to Miss World-America Pageant and World-Wide Pageant Corporation (the "Miss World-America" defendants) which fully performed their franchise obligations. These companies were again to purchase the 1981 national Miss World franchise from the owners of Miss World, *see* Affidavit of E. Morley at 3–4 (Apr. 5, 1982), and, in keeping with standard practice, they executed franchise agreements that directed state franchisees to hold state beauty contests and send the winners to the national competition. The complaint alleges that, to induce potential franchisees to purchase and undertake the 1981 franchise agreements, the World America defendants represented that they had plans to televise the national pageant, to hold the pageant in Florida or Las Vegas, and to make available

to these franchisees the 1982 franchise at the same price as 1981. Amended Complaint ¶ 12. The state franchisees in turn relayed these representations to potential contestants to induce their entry into the state Miss World pageants. *Id.* at ¶¶ 14–15. No 1981 National pageant took place, however, no state winner of a Miss World pageant went to the international competition, and no 1982 franchise was offered to any 1981 franchisee. *Id.* ¶¶ 13–19. Instead, the World defendants, through an agreement with the owners of the Miss Universe pageant, obtained as their United States representative to the international competition the runner-up of the 1981 national Miss Universe-America beauty pageant, the winner of which went on to the Miss Universe International competition. In exchange for obtaining the Miss Universe runner-up, the Miss World defendants agreed not to hold or authorize any Miss World competitors with the United States.

Plaintiff Gianna Enterprises ("Gianna") commenced this action on behalf of itself and others to recover damages arising out of these changes in the running of the Miss World beauty pageant. Gianna was the 1981 New Jersey franchisee of the Miss World system, and had expected to be able to place its winner in the national contest, and to become the Miss World franchisee for New Jersey in 1982.

Gianna also seeks to represent a class of all state Miss World franchisees and all winners of the state pageants. Gianna claims that the state franchisees "suffered severe damage to their credibility, reputation and goodwill" in their home states and also lost the sponsorship revenues expected to be generated through national television and newspaper exposure. Amended Complaint at ¶¶ 17–18, 23–30. The contestants, Gianna claims, lost valuable newspaper and television publicity, which "has the effect of launching a girl's career like a star blazing across the midnight sky." *Id.* at ¶¶ 19, 36, 40. In addition, under an antitrust theory, Gianna seeks treble the damages that it alleges under its contract and fraud theories. The suit names as defendants on all claims the owners of Miss World, and the Miss World America national franchisees; on the antitrust claim the complaint also joins Miss Universe, Inc., its owner Gulf and Western Industries, Inc., and its director Harold Glasser (the "Miss Universe defendants"). Plaintiff asserts both diversity and federal question jurisdiction.

Five motions are now pending: (1) all the defendants have moved to dismiss plaintiff's antitrust claim; (2) plaintiff has moved for class certification; (3) the Miss Universe defendants seek an award of attorneys' fees under 28 U.S.C. § 1927 (Supp. IV 1980) and the court's general equitable power for costs borne in defending the antitrust claim; (4) the Miss World defendants have moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction; and (5) defendant Morley has moved to quash the service made upon him.

I. *Motion to Dismiss the Antitrust Claim*

Plaintiff claims that the agreement between the owners of Miss World and the Miss Universe defendants violates the Sherman Act, 15 U.S.C. § 1 (1976), which makes illegal "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations ...." In general, plaintiff's claim falls victim to the basic tenet that "[t]he antitrust laws ... were enacted for 'the protection of *competition,* not *competitors.*'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 478, 97 S.Ct. 690, 692, 50 L.Ed.2d 701 (1977) (emphasis in original) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)); *see Copy-Data Systems, Inc. v. Toshiba America, Inc.,* 663 F.2d 405, 410–11 (2d Cir.1981).

To state an antitrust claim, plaintiff must show that defendants acted to restrain competition. To do so, plaintiff must first identify the relevant product market and the alleged restraint. *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832, 840 (2d Cir.1980); *Coniglio v. Highwood Services, Inc.,* 495 F.2d 1286, 1292 (2d Cir.), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974).

Plaintiff defines the relevant product market as one for international beauty pageants. It alleges that the consumers in this service market are the state franchisees and the beauty pageant contestants, and as thus defined Miss World and Miss Universe are its only competitors. Plaintiff has failed, however, to attempt to explain why this market excludes other state and national beauty pageants, of which there are dozens if not hundreds. Moreover, it has made no attempt to explain why beauty pageants alone can be treated as a separate market for competition to obtain modelling or other positions in the advertising or entertainment world. Plaintiff admits that the contestants compete primarily for the opportunity to gain access to such careers. *See* Conference Transcript at 4–5 (Sept. 17, 1982). Plaintiff simply delineates the product market based on the perceived similarity of services offered. This bears no rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand for potential substitute products. *See Brown Shoe v. United States, supra,* 370 U.S. at 325, 82 S.Ct. at 1523; *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co., supra,* 614 F.2d at 840. The Court cannot accept the market boundaries offered by plaintiff without at least a theoretically rational explanation for excluding the publicity potential offered by lesser pageants or different media.

■ The absence of an adequate market definition makes it impossible even to approximate the market effect of defendants' allegedly anticompetitive agreement. Plaintiff concedes that the Miss World beauty contestants can all compete in the Miss Universe contest, and that the Miss World state franchisees can bid for franchises to operate the statewide contests for Miss Universe. Plaintiff asserts only that the entry fees for contestants went up from $350 in 1981 to $500 in 1982 as a result of the agreement, *see* Amended Complaint ¶ 42(b), and that the opportunities to be a state franchisee will be reduced from two per state to one. These claims fail to satis-

fy the requirement that a section 1 claimant allege how the net economic effect of the alleged violation is to restrain trade in the relevant market, and that no reasonable alternate source is available. *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 132–33 (2d Cir.) (*en banc*), cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). The entry fee for Miss Universe is *de minimus* and does not even approach a level that would cover the costs of processing each contestant. That the number of state franchise opportunities is reduced does not significantly affect commerce insofar as it reduces the opportunities of would-be franchisees to obtain franchises, though not to compete for them.

■ Plaintiff seeks to neutralize the inadequacy of its pleadings by characterizing the agreement as a *per se* violation. *Per se* violations do not require a showing of deleterious impact on competition. The acts involved are considered so repugnant to the policies underlying antitrust law that they create a presumption of anticompetitive effect. *See Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 212–13, 79 S.Ct. 705, 709–710, 3 L.Ed.2d 741 (1959); *Copy-Data Systems, Inc. v. Toshiba America, Inc.,* 663 F.2d 405, 408 (2d Cir.1981). Only a narrow class of practices, however, warrant classification as *per se* violations. *Continental T.V., Inc., v. GTE Sylvania Inc.,* 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557–2558, 53 L.Ed.2d 568 (1977); *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). In *Klor's,* for example, a group of retailers combined for the sole purpose of eliminating competition from a retailer who sold competing products at a discount. 359 U.S. at 212–13, 79 S.Ct. at 709–710. Agreements that lack an obvious anticompetitive effect, and that may be supported by rational business planning, cannot be treated as *per se* violations. Rather, Section 1 challenges to these agreements must be resolved under a rule of reason approach which weighs all relevant circumstances to decide whether they justify the practice notwithstanding demonstrated anticompetitive effects.

■ Plaintiff has failed to provide evidence of anticompetitive effect. That Gianna and the other former state franchisees lost their franchises is insufficient. *See Copy-Data, Systems, Inc. v. Toshiba America, Inc., supra,* 663 F.2d at 408; *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co., supra,* 614 F.2d at 841; *Oreck Corp. v. Whirlpool Corp., supra,* 579 F.2d at 133. Plaintiff cannot convert the losses it may have sustained as a result of alleged breaches of contract and misrepresentations into an antitrust claim, without demonstrating the type of injury against which the antitrust laws were intended to protect.

■ Plaintiff also lacks standing to assert its antitrust claim. Courts circumscribe narrowly the types of antitrust injuries that will support standing to sue for money damages. Plaintiffs must establish more than a causal link between the damages alleged and the illegal market practice; plaintiff must prove antitrust injury, *i.e.* injury emanating directly from the anticompetitive practice. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). In the beauty pageant market proffered by plaintiff, those that would suffer directly from the anticompetitive effects, and thereby come within the target area test applied by the Second Circuit, *see Calderone Enterprises Corp. v. United Artists Theatre Circuit,* 454 F.2d 1292, 1295–96 (2d Cir.1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); *NAACP v. New York Clearing House Ass'n.,* 431 F.Supp. 405, 408 (S.D.N.Y.1977), are franchisees and contestants in the Miss Universe System who might have to pay a monopoly price and other beauty pageants that might suffer adversely from this alleged monopolization. Former contestants and franchisees of Miss World suffer only indirectly and therefore do not gain standing.

Plaintiff's antitrust claim is dismissed with prejudice for the reasons stated. Leave to amend further is denied; plaintiff has already once been granted leave to amend, after being advised of the weaknesses in its antitrust claim.

## II. *Class Certification*

Plaintiff's motion to certify a class composed of all state franchisees of World-Wide and all winners of state Miss World beauty pageants is meritless in light of the insufficiency of its antitrust claim, and for additional reasons. Plaintiff asserts that the pageant winners are properly included in this proposed class as third party beneficiaries of the franchise agreements, whose claims are identical to those of the state franchisees.

■ To gain certification plaintiff must satisfy four Rule 23(a) prerequisites: a) that the class is so numerous that joinder is impracticable, b) that common questions of law and fact exist, c) that its claims or defenses typify those of the class, and d) that it will fairly and adequately protect the class interests. *See DeMarco v. Edens,* 390 F.2d 836, 845 (2d Cir.1968). In addition, it must show that the common questions of law or fact predominate over questions affecting only individual class members and that the class action is the fairest and most efficient means of resolving the dispute. Fed.R.Civ.P. 23(b)(3). Plaintiff has failed to satisfy several of these requirements.

First, some of the state pageant winners harbor interests antagonistic to the state franchisees, *see* Pl. Memo in Opposition to Dismissal of 3d Claim at 3, which might prompt inconsistent settlement interests. *See e.g., In re Fine Paper Antitrust Litigation,* 617 F.2d 22, 26 n. 6 (3d Cir.1980); *United States Fidelity & Guarantee Co. v. Louis A. Roser Co.,* 585 F.2d 932, 937–39 (8th Cir.1978); *Koenig v. Smith,* 88 F.R.D. 604, 608 (E.D.N.Y.1980). Plaintiff has also failed to demonstrate that these winners stand as anything other than incidental beneficiaries to the franchise agreements, lacking any direct claims against defendants. Moreover, plaintiff is not a member of this putative class. *See Ambook Enterprises v. Time, Inc.,* 612 F.2d 604, 608 (2d Cir.1979), *cert. dismissed,* 448 U.S. 914, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980). Absent these persons, the putative class plaintiff seeks to certify contains approximately thirty-five to fifty state franchisees. Al-

though so small a number is not necessarily fatal to class status, it becomes so when coupled with the numerous other defects in plaintiff's application.

Defendants correctly claim that plaintiff and its counsel are incapable of satisfying the stringent fiduciary standards imposed upon class representatives by the courts. *See, e.g., Ambook Enterprises v. Time, Inc., supra,* 612 F.2d at 608; *National Ass'n of Regional Medical Programs, Inc. v. Mathews,* 551 F.2d 340, 344–46 (D.C.Cir.1976), *cert. denied,* 431 U.S. 954, 97 S.Ct. 2674, 53 L.Ed.2d 270 (1977); *Kendler v. Federated Department Stores, Inc.,* 88 F.R.D. 688, 693–94 (S.D.N.Y.1981). Given the weaknesses in the antitrust claim asserted in this case, this Court could not in good conscience permit plaintiff's counsel to represent anyone in this proceeding who did not knowingly accept his representation.

Plaintiff's argument that its action presents common questions is based largely on its antitrust claims. These "common" antitrust questions are removed from the case, however by dismissal of the antitrust claim. Individualized questions predominate under the state law contract and fraud claims that remain; the question of reliance is central to each fraud claim and the question of intent underlies each contract claim. Moreover, the individual damage claims will require focusing on the circumstances surrounding each franchise agreement. These particularized inquiries outweigh the common questions surrounding the alleged misrepresentation. Nor is the class action "superior to the other available methods for the fair and efficient adjudication of the controversy." This case does not involve the aggregation of small, individual claims, and the franchisees and contest winners could either be joined in the present action, or could bring separate actions against defendants.

### III. *Jurisdiction Over the Owners of Miss World*

The owners of Miss World move under Rule 12(b)(2) to dismiss the complaint against them for lack of personal jurisdiction. With only state law claims remaining after dismissal of plaintiff's federal antitrust claim, New York law governs the jurisdictional issue. *See Arrowsmith v. United Press International,* 320 F.2d 219, 223 (2d Cir.1963).

Defendants allege without contradiction that they have no New York subsidiary, division, agents, employees, office, telephone, or bank account, and have engaged in no business transaction in this state. Defendants correctly assert their immunity from long-arm jurisdiction under CPLR § 302(a) (McKinney 1972 & Supp.1981); neither their alleged breach of contract nor their alleged tortious conduct had the requisite impact within this state to satisfy the statute. Under § 302(a)(1) the breach must arise from business transacted within the state or from a contract to supply goods or services in the state. The pleadings make clear that no contract exists between plaintiff and the defendants to satisfy this standard, and no injury to plaintiffs occurred in New York from any alleged tort. *See Fantis Foods, Inc. v. Standard Importing Co.,* 49 N.Y.2d 317, 326, 402 N.E.2d 122, 125–26, 425 N.Y.S.2d 783, 786–87 (1980).

CPLR § 301 therefore provides the sole basis for claiming jurisdiction over these defendants. Under this section, which retains traditional common-law means of acquiring jurisdiction, jurisdiction may be gained over out-of-state defendants that establish sufficient contacts with the state to establish that they were "doing business" here at the time the claim arose. Plaintiff claims that Morley's frequent visits to New York, and his strong affiliation with Variety Clubs International, a New York based charitable organization, import such presence. Due process requires contacts more extensive than these before it will presume a party generally present for claims unrelated to those contacts; it demands that a party benefit from the protection of local laws in such a way that he would foresee the possibility of suit under those laws. *See World-Wide Volkswagon Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). Forcing Morley to defend a suit in New York

solely on the scant representations concerning his affiliation with Variety Clubs simply does not satisfy the principles of justice and fair play which underlie due process. *Id.; see also International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

The Miss World corporations, on the other hand, are subject to New York's jurisdictional reach under section 301. The New York courts have general personal jurisdiction over foreign corporations that engage in so regular a course of business in New York that they are deemed to be "doing business" here. *Jayne v. Royal Jordanian Airlines Corp.,* 502 F.Supp. 848, 856 (S.D.N.Y.1980). The problem of the precise level of business activity necessary "to subject a foreign corporation to suit . . . on an unrelated cause of action is such that the formulation of useful standards is almost impossible. . . ." *Aquascutum of London, Inc. v. S.S. American Champion,* 426 F.2d 205, 211 (2d Cir.1970). In this case, however, the defendants' franchise relationship with World-Wide Pageant Corp., ("World-Wide") and the services that World-Wide performs in New York satisfy the doing business test.

Defendants rely principally on *Delagi v. Volkswagenwerk AG of Wolfsburg, Germany,* 29 N.Y.2d 426, 278 N.E.2d 895, 328 N.Y.S.2d 653 (1972), to argue that their franchise relationship with World-Wide will not substitute for their own New York presence for jurisdictional purposes. *Delagi,* however, is inapposite. In that case, a New York domiciliary sought jurisdiction over defendant, Volkswagenwerk AG, to seek compensation for injuries she sustained in Germany caused by defects in the Volkswagen she had purchased there. The Court of Appeals refused to found jurisdictional presence solely on the distribution chain by which defendant's automobiles came into the United States through its New Jersey subsidiary, and then entered New York through an independently owned corporation. The Court would not infer an agency relationship between the defendant and its New York distributor, *id.* at 431, 278 N.E.2d at 897, 328 N.Y.S.2d at 656, and

since "mere sales of a manufacturers product in New York, however substantial, have never made the . . . manufacturer amenable to suit," *id.* at 433, 278 N.E.2d at 898, 329 N.Y.S.2d at 657, the Court would not find defendant present.

The Second Circuit decision in *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116 (2d Cir.), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1967), provides the appropriate standard for determining whether the business done by World-Wide is fairly attributable to the Miss World defendant corporations. In *Gelfand,* a bus touring company that transacted no business in New York and maintained no New York office was found present through an arrangement it had with an unaffiliated independent contractor in New York to book and confirm reservations for its Grand Canyon tours. In reaching its decision the Court embellished upon a test first announced in *Frummer v. Hilton Hotels Int'l, Inc.,* 19 N.Y.2d 533, 227 N.E.2d 851, 854, 281 N.Y.S.2d 41, 44 (1967), that counselled finding presence when a " '[s]ervice does all the business which [defendant corporation] could do were it here by its own official.' " *Gelfand v. Tanner Motors, Ltd., supra,* 385 F.2d at 120–21 (quoting *Frummer v. Hilton Hotels Int'l Inc., supra,* 19 N.Y.2d at 537, 227 N.E.2d at 854, 281 N.Y.S.2d at 44). It ruled "that a foreign corporation is doing business in New York 'in the traditional sense' when its New York representative provides services beyond 'mere solicitation' and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." 385 F.2d at 121. Recent decisions reaffirm the *Gelfand* standard as determinative of whether an agency relationship establishes the presence of the principal. *See e.g., Bulova Watch Co. v. K. Hattori & Co.,* 508 F.Supp. 1322, 1333–34 (E.D.N.Y. 1981).

The relationship between the owners of Miss World and World-Wide establishes the defendants' jurisdictional presence. The

Miss World corporations delegated substantial authority to their franchisee, World-Wide, to oversee the running of state beauty pageants and to run the Miss World-U.S.A. beauty pageant. In return they were sent the United States representative for their international beauty pageant. Without World-Wide's activities or some alternate arrangement, these defendants would have had to establish their own corporate presence and undertake the selection of a national contestant. The only alternative to maintaining these contacts was to forego entirely having their own United States contestant, an option they would presumably find unattractive given the interest Miss World has shown in maximizing its United States market—*i.e.* holding an unofficial pageant in Miami to capture national attention. *See* Pl. Supp. Memo in Opposition at 7–8. Therefore, it seems clear that "these services [were] sufficiently important to [Miss World] that if it [had no] representative to perform them, the corporation's own officials would [have] undertake[n] to perform substantially similar services." *Gelfand v. Tanner Motors, Ltd., supra,* 385 F.2d at 121.

### IV. *Motion to Quash Service*

Defendant Morley moves to quash service upon him alleging that the summons failed to comply with the requirements of form under Fed.R.Civ.P. 4(b). Rule 4(b) requires, among other things, that the summons "be signed by the clerk, [and] be under seal of the court." The summons served upon defendant Morley met neither of these requirements.

■■■■■ Harmless errors that otherwise give a defendant proper notice, such as misspelling the defendant's name or referring defendant to the complaint for the proper caption, are clearly amendable *nunc pro tunc* under Rule 4(h). *See Newman v. Prior,* 518 F.2d 97, 99 (4th Cir.1975); 4 C. Wright & A. Miller, *Federal Practice & Procedure* § 1088 (1969). Service of an unsigned and unsealed summons, however, is a more serious infraction for which a court, in its discretion, need not allow amendment. Such service may demonstrate a flagrant

disregard for the rules and fails to assure the person served that the summons was in fact issued by the clerk of a court and not by the plaintiff or his attorney. *See Kramer v. Scientific Control Corp.,* 365 F.Supp. 780, 788 (E.D.Pa.1973); 2 J. Moore, *Moore's Federal Practice* ¶ 4.07[1] n. 2 (2d ed. 1982); 4 C. Wright & A. Miller, *supra,* §§ 1088, 1131. *But see United States v. Echevarri,* 65 F.R.D. 21, 23 (D.P.R.1974). The very existence of Rule 4(b) counsels that a defendant should not be made to answer a summons and complaint without first being given proper notice of the nature of the suit *and* being assured that the summons properly issues from a court. To allow plaintiffs always to amend their defective summons under these circumstances would eviscerate and make a mockery of the formal commands of Rule 4(b), and would risk prejudice to the defendant improperly served.

■■■■■ Plaintiff relies on the New York Civil Practice Law and Rules, which do not require that a summons issue from the court, to excuse its disregard for this federal requirement. Plaintiff cannot gain refuge in the CPLR, however. Rule 4(b) allows state requirements to replace federal requirements only when service is made out of state, and not when a defendant is served in the state in which the court sits. *See* 2 J. Moore, *supra* ¶ 4.07[2]. Plaintiff also relies on *Maricopa County v. American Petrofina Inc.* 322 F.Supp. 467 (N.D.Cal. 1971), a case in which the court denied a motion to quash service of a summons with defects similar to plaintiff's summons. That case is inapposite, however, because there defendant had acted as though service was sufficient and it was not in any way prejudiced by allowing amendment of the summons. The court reasoned:

Had there been any suggestion that defendant intended to claim an insufficiency of process, rather than to respond to the complaint, the Court would have refused to approve the stipulation. Were the Court to now quash service of summons the plaintiff could, assuming that plaintiff's counsel has access to the Fed-

eral Rules of Civil Procedure, make a valid service. Defendant would gain nothing but time . . . .

*Id.* at 469–70. Here, defendant Morley has treated the service as ineffective, protesting from the outset, and he would be prejudiced by allowing the summons to be amended *nunc pro tunc,* since he is a resident of Great Britain and would not so easily be re-served by plaintiff. Finally, in exercising discretion under this Rule a court should consider whether the plaintiff's blunder resulted from innocent mistake or inexcusable neglect. Here, the plaintiff has evidenced a consistent disregard for legal requirements, both procedural and substantive. In failing to comply with Rule 4, counsel's conduct was the product of a sloppy disregard for federal requirements, making the rule's enforcement appropriate.

## V. Attorneys' Fees

Defendants seek to tax plaintiff and its attorney their attorneys' fees incurred in defending what they term a patently frivolous antitrust claim brought in bad faith. They argue that plaintiff's "blatant attempt to manufacture an antitrust claim where one did not exist . . . in order to force an early settlement of its claims and to find a 'deep pocket' against which it could recover,'" Def.Memo. at 2, supplies the basis for such an award under the court's general equitable power, or under 28 U.S.C. § 1927 (Supp. IV 1980).

Absent congressional authorization to the contrary, the American Rule compels each side to bear its own litigation costs unless one party has "acted in bad faith, vexatiously, wantonly, or for oppressive purposes." *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622–1623, 44 L.Ed.2d 141 (1975); *see Roadway Express, Inc. v. Piper,* 447 U.S. 752, 759, 100 S.Ct. 2455, 2460, 65 L.Ed.2d 488 (1980); *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir.1980). Section 1927 requires vexatious conduct to justify an award of attorneys' fees. Its purpose is to deter attorneys who would unreasonably and vexatiously "multiply"

litigation by imposing on them "personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct." 28 U.S.C. § 1927 (Supp. IV 1980). In order not to deter an attorney from his ethical duty to "represent his client zealously," *Acevedo v. INS,* 538 F.2d 918, 921 (2d Cir.1976) (*per curiam*) (quoting *Model Code of Professional Responsibility* EC 7–1), courts have read the "unreasonably and vexatiously" standard to impose the costs of litigation on counsel only for behavior that constitutes "an intentional departure from proper conduct," *United States v. Ross,* 535 F.2d 346, 349 (6th Cir.1976), an intent only to harass, *Fisher v. Fashion Institute of Technology,* 491 F.Supp. 879, 888 (S.D.N.Y.1980), or "bad faith" in relation to what "counsel knew or should have known", *North American Foreign Trading Corp. v. Zale Corp.,* 83 F.R.D. 293, 297 (S.D. N.Y.1979). *See also Nemeroff v. Abelson, supra,* 620 F.2d at 350; *West Virginia v. Charles Pfizer & Co.,* 440 F.2d 1079, 1092 (2d Cir.), *cert. denied sub nom. Cotler Drugs, Inc. v. Charles Pfizer & Co.,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

Thus, the court's equitable and § 1927 powers are guided by the similar if not identical standard. " '[C]lear evidence' that the claims are 'entirely without color *and* made for reasons of harassment or delay or for other improper purposes,'" must exist in order to find bad faith. *Nemeroff v. Abelson, supra,* 620 F.2d at 348 (emphasis in original) (quoting *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1088 (2d Cir.1976)). Neither element of this test is satisfied here with sufficient clarity to find exception to the American Rule, or to prove vexatious purpose. Although plaintiffs' antitrust claim is frivolous, one cannot safely say that no "reasonable attorney could have concluded that facts supporting the claim *might be established.*" *Nemeroff v. Abelson, supra,* 620 F.2d at 348 (emphasis in original). Plaintiff's attorney might in good faith have felt that the events prompting the selection of Miss World-U.S.A. from the Miss Universe system were sufficient to suggest an anti-

trust conspiracy. Furthermore, no clear evidence exists that plaintiff asserted its antitrust claim for improper purposes. Inartful pleading and ignorance of legal requirements do not amount to the intentional abuse of judicial process that is the target of protective awards of attorneys' fees. The pleadings and memoranda of law filed by plaintiff suggest nothing more than an untenable antitrust claim, not improper conduct.

In conclusion, therefore, defendants' motion to dismiss the antitrust claim is granted but the request for attorneys' fees is denied; class certification is denied; defendant Morley's motions to quash service and to dismiss for lack of jurisdiction are granted; and the motion of Miss World (UK) and Miss World (Jersey) to dismiss for lack of jurisdiction is denied.

SO ORDERED.