Roberta TODD, Plaintiffs,

v.

EXXON CORPORATION,
et al., Defendants.

No. 97 Civ. 4557(JES).

United States District Court,
S.D. New York.

Dec. 27, 2000.

Carney & McKay, Pelham, NY (John F. Carney, Robert McKay, of counsel), Miller Faucher Cafferty & Wexler, LLP, Philadelphia, PA (J. Dennis Faucher, Ellen Meriwether, of counsel), Joseph P. Garland, New York City, for plaintiff.

Sullivan & Cromwell, New York City (James H. Carter, James V. Masella, III, of counsel), for Exxon Corporation.

Clifford Chance Rogers & Wells, New York City (James C. Egan, Jr., Sean M. Murphy, of counsel), for Shell Oil Company.

Pepper Hamilton, LLP, Philadelphia, PA (Jon A. Baughman, Nicole D. Galli, of counsel), John B. Glendon, New York City, for Sun Company.

Hunton & Williams, New York City (Christopher M. Mason, of counsel), for Mobil Corporation.

Cravath, Swaine & Moore, New York City (John E. Beerbower, of counsel), for B.P. America Inc.

Arnold & Porter, Washington, DC (Mark R. Merley, of counsel), for Occidental Petroleum Corporation.

Gibson, Dunn & Crutcher, LLP, Washington, DC (M. Sean Royall, of counsel), for Philips Petroleum Company.

Howrey & Simon, Washington, DC (Matthew S. Wild, Alan M. Grimaldi, Marc Schechter, of counsel), Texaco Inc., White Plains, NY (Lawrence R. Jerz, Robert D. Wilson, David A. Luttinger, of counsel), for Texaco, Inc.

Pillsbury Madison & Sutro LLP, Washington, DC (Terry Calvani, of counsel), for Chevron Corp.

Brobeck, Phleger & Harrison, LLP, New York City (Gregory R. Markel, of counsel), for Conoco, Inc.

Defrees & Fiske, Chicago, IL (Ronald W. Teeple, of counsel), for Marathon Oil Company.

Dewey Ballantine, LLP, New York City (Saul P. Morgenstern), Los Angeles, CA (Jeffrey R. Witham, of counsel), for Unocal Corporation.

Kirkland & Ellis, New York City (Yosef J. Riemer, Jonathan F. Putnam), Chicago, IL (Richard Godfrey, J. Andrew Langan, of counsel), Atlantic Richfield Company, Los Angeles, CA (Ronald C. Redcay, of counsel), for Amoco Corporation.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff Roberta Todd ("plaintiff") brings this action, on behalf of herself and all other similarly situated current and former Exxon employees, against Exxon Corporation and thirteen (13) other oil and petrochemical companies (collectively "the oil companies" or "defendants"), alleging that defendants violated section 1 of the

Sherman Act[1] by sharing salary information regarding certain of defendants' employees and agreeing to use this information to set the salaries of these employees at artificially low levels. Defendants have moved, pursuant to Fed.R.Civ.Pro. 12(b)(6), to dismiss plaintiff's Amended Complaint for failure to state a claim. For the reasons set forth below, the Court grants defendants' motion to dismiss plaintiff's Amended Complaint.

## FACTS

The allegations of the Second Amended Complaint ("Amended Complaint")[2] are presumed to be true for the purposes of this motion[3] and are as follows. Defendants, who collectively account for eighty to ninety percent of the oil and petrochemical industry revenues and employ approximately the same percentage of that industry's workforce, routinely exchanged information on the salaries, bonuses, and other compensation paid to all of their nonunion managerial, professional, and technical ("MPT") employees. *See* 2d Amend.Compl. at 4. According to plaintiff, defendants used this information for the sole purpose of coordinating—or, more specifically, stabilizing and depressing—

the compensation paid to MPT employees throughout the industry. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl. Opp.Mem.") dated January 13, 1999 at 1. As evidence of this alleged violation of the antitrust laws, plaintiff points to the assurances each defendant gave that the information exchanged would primarily be used to the set salaries of MPT employees. *See* 2d Amend.Compl. at ¶ 10.

Plaintiff devotes most of her Amended Complaint to detailing the ways in which defendants shared compensation information. Plaintiff explains that the information shared included historical compensation data, "Job Match Survey" data,[4] and "Job Family Survey" data.[5] *See* Pl. Opp.Mem. at 5. Moreover, defendants apparently held various meetings each year where human resources personnel from each of the defendant companies allegedly would exchange salary-related information. *See id.* at 7–8. Plaintiff makes no allegation that defendants reached an agreement regarding the particular use to be made of the shared information. Plaintiff also does not set forth any allegations that explain how exactly the sharing of compensation

---

1. Section 1 of the Sherman Act provides:

   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court

2. Plaintiff initially brought this action against Exxon Corporation. She subsequently amended her Complaint twice and in so doing added the other thirteen (13) oil companies as defendants. *See* Second Amended Complaint ("2d Amend.Compl.") dated October 30, 1998 at ¶¶ 15–29.

3. The Court recognizes the well established rule that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted); *see also Hunt v. Mobil Oil Corp.*, 410 F.Supp. 10, 14 (S.D.N.Y.1975), *aff'd* 550 F.2d 68 (2d Cir. 1977).

4. This "Job Match Survey" compared the responsibilities and compensation packages offered by defendants for certain jobs and job types against the compensation and responsibilities for the "benchmark" positions at Unocal and Chevron. *See* Pl.Opp.Mem. at 5–6.

5. This survey sought and obtained current data on the actual compensation paid by defendants to employees in various "job families." The information gathered was distributed to the survey participants several times a year. *See* Pl.Opp.Mem. at 6–7.

information caused Exxon and the other defendants to pay MPT employees salaries that were lower than they would have been absent the exchange. Instead, plaintiff simply recites various statistics about the fluctuations in salary levels of one defendant—Exxon—that plaintiff alleges prove the anticompetitive effects of the information exchange.

Specifically, as evidence of the stabilizing and depressive effects of the information exchange, plaintiff cites, *inter alia,* the following facts. Exxon's "competitive factor"—the percentage by which Exxon would need to increase its salary levels in order to match the salaries offered by the competition—decreased from 6.5% in 1991 to 0% in 1995.[6] *See* 2d Amend.Compl. at ¶ 109. Plaintiff also emphasizes that Exxon's salaries dropped 4.1% between 1987 and 1994 in comparison to Exxon's six (6) major competitors ("the six majors"). *See id.* at ¶ 75. Plaintiff claims that the information exchanged allowed Exxon to keep its MPT salary levels slightly above these six majors and slightly below the salary levels of the three industry compensation leaders ("the high three"). *See id.* at ¶ 68. Ultimately, plaintiff alleges that the various information exchanges allowed Exxon to "reduce its pay vis-à-vis its competitors from 110.7% in 1987 to 107%.0 in 1993." *Id.* at ¶ 89. Based on these factual allegations—which, again, the Court accepts as true for the purposes of this motion—the plaintiff concludes it is "reasonable to infer that both the purpose and effect of the salary exchange program was to minimize competition among [d]efendants for their MPT employees and to stabilize the salaries of these employees at levels lower than would have prevailed in a competitive market." Pl.Opp.Mem. at 9.

**6.** In 1993, Towers Perrin (the independent company that assembles and disseminates the results of most of the compensation surveys in which defendants participate, *see, e.g.,* 2d Amend.Compl. at ¶¶ 69–70) informed Exxon that Exxon's compensation levels in several job families were higher than its competitors. *See id.* at ¶¶ 114. As a result of receiving this information, Exxon set a 0% competitive fac-

## DISCUSSION

Plaintiff's claim under section 1 of the Sherman Act is legally insufficient and must be dismissed. Quite simply, "[t]aking the allegations of the [Second] Amended Complaint as true ... it does not appear that there is any set of facts plaintiff could prove in support of [her] complaint that would entitle [her] to relief because plaintiff has failed adequately to define the relevant product market, to allege antitrust injury, or to allege conduct in violation of the antitrust laws." *Re–Alco Indus., Inc. v. National Ctr. Health Educ., Inc.,* 812 F.Supp. 387, 391 (S.D.N.Y.1993) (Mukasey, J.) (citations omitted).

■ Section 1 prohibits contracts, combinations, or conspiracies in restraint of trade; it does not prohibit exchanges of information among competitors, *per se.* As the Supreme Court has explained, exchanges of information among competitors are common and "can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *United States v. United States Gypsum Co.,* 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). In fact, the Department of Justice and the Federal Trade Commission explicitly recognize that information exchanges:

> can have significant benefits for ... consumers. [Companies] can use information derived from price and compensation surveys to price their services more competitively and to offer compensation that attracts highly qualified personnel.

Dept. of Justice & Federal Trade Comm'n, *Statements of Antitrust Enforcement Policy in Health Care,* Statement 6 (1996).

tor. *See id.* Based on these alleged facts, it is the Court's understanding that the competitive factor represents the percentage by which Exxon would have to *increase* its salaries to match certain of its competitors. Hence, a reduction in the competitive factor would indicate that a company has increased its salaries to match the competition.

Hence, as at least one other court has already held, the exchange of salary information is not itself a violation of section 1 and therefore must be analyzed under the rule of reason. *See Five Smiths v. NFL,* 788 F.Supp. 1042, 1046–47 (D.Minn.1992).

■ Under the rule of reason approach, plaintiff must "show that defendants acted to restrain competition. In order to make such a showing and thereby survive a motion to dismiss, a section 1 claimant must identify the relevant product market and allege how the net effect of the alleged violation is to restrain trade in the relevant market." *International Television Prods. Ltd. v. Twentieth Century–Fox Television of Twentieth Century–Fox Film Corp.,* 622 F.Supp. 1532, 1539 (S.D.N.Y.1985) (citation and internal quotations omitted); *see also George Haug Co. v. Rolls Royce Motor Cars, Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (explaining that to establish the requisite antitrust injury, plaintiff must demonstrate that defendants' actions "had an actual adverse effect on competition as a whole in a relevant market" (citation and internal quotations omitted)). Plaintiff has set forth no facts that would lead to a reasonable inference supporting that conclusion.

■ In short, the relevant market proposed by plaintiff does not rise to the level of plausibility required in an antitrust action. A market must be plausible in the sense that it "bears [a] rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand for potential substitute products." *Gianna Enters. v. Miss World (Jersey) Ltd.,* 551 F.Supp. 1348, 1354 (S.D.N.Y.1982). Thus, plaintiff must plead facts which tend to show that the "products" at issue here—MPT employees—are reasonably interchangeable or that there is a cross-elasticity of de-

mand for potential substitutes. Plaintiff has not pleaded such facts. In this case, plaintiff has failed to explain how it is that accountants, lawyers, chemical engineers and other MPT employees in the oil and petrochemical industry are interchangeable with one another when the jobs they perform are so different. In another sense, plaintiff's proposed market is quite underinclusive. For example, plaintiff fails to adequately explain why an antitrust lawyer employed by an oil company does not compete in the same market as an antitrust lawyer at a commercial bank or in a private law firm.

Plaintiff contends that the special skills and knowledge that the MPT employees obtained while working for defendants limits their job opportunities. *See* 2d Amend. Compl. at ¶ 97. Perhaps plaintiff is correct that certain MPT employees, such as scientists with highly specialized knowledge and training, are limited in this way. But plaintiff has not limited her proposed class to persons such as these.[7] The proposed class consists of all MPT employees—not just, for example, organic chemists. Indeed, plaintiff's basis for arguing that the relevant market should consist of all MPT employees is that defendants exchange compensation information only with each other because defendants "perceive and recognize the relatively low level of cross elasticity of demand for the services of MPT employees with experience in the oil ... industry." 2d Amend.Compl. at ¶ 99. Taken to its logical conclusion, this would lead to the circuitous result that the scope of the relevant product market in any antitrust action challenging salary exchanges would be defined by the scope of the salary exchange itself. The Court cannot accept this theory as a plausible relevant market. Since it is evident that plaintiff's proposed market cannot be explained by resort to any economically plausible method, it is clear that plaintiff has

7. Having already granted plaintiff the opportunity to amend her complaint to remedy deficiencies that defendant had previously identified, the Court will not allow plaintiff yet another opportunity to amend her complaint to remedy the deficiencies the Court has identified in this Memorandum Opinion and Order.

impermissibly attempted to "conform [her] theory to the facts [she] allege[s]." *Belfiore v. New York Times Co.*, 826 F.2d 177, 180 (2d Cir.1987). As Judge Leisure once announced, "[t]he federal courts, in the context of Rule 12 motions to dismiss, have not hesitated to reject market allegations that make no economic sense under any set of facts." *Theatre Party Assocs., Inc. v. Shubert Org., Inc.*, 695 F.Supp. 150, 154 (S.D.N.Y.1988) (Leisure, J.).

"The absence of an adequate market definition makes it impossible even to approximate the market effect of defendants' allegedly anticompetitive agreement." *Gianna Enters.*, 551 F.Supp. at 1354. That is precisely why the courts of this district routinely dismiss antitrust actions where the claimant fails to plead a plausible relevant product market. *See, e.g., E & G Gabriel v. Gabriel Bros., Inc.*, No. 93–CV–0894, 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994) (Leisure, J.) ("Plaintiff's failure to define [the] market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal."); *accord Global Disc. Travel Servs. v. TWA*, 960 F.Supp. 701, 705–06 (S.D.N.Y.1997); *Re–Alco*, 812 F.Supp. at 391; *North Jersey Secretarial Sch., Inc. v. McKiernan*, 713 F.Supp. 577, 583–84 (1989); *Shaw v. Rolex Watch U.S.A., Inc.*, 673 F.Supp. 674, 679 (S.D.N.Y.1987) (Conner, J.) ("This Court does not need protracted discovery to state with confidence that Rolex watches are reasonably interchangeable with other high quality timepieces. Since plaintiff has not alleged a plausible product market, his ... claims are dismissed.").[8] Thus, the Court finds

that, standing alone, plaintiff's failure to plead facts establishing a plausible relevant market warrants dismissal of her section 1 action.

Plaintiff contends that she does not need to demonstrate a plausible relevant market for her action to continue because defendants possess significant market power, which is but a "surrogate for detrimental effects." *Indiana Fed. of Dentists*, 476 U.S. at 461, 106 S.Ct. 2009 (internal quotations omitted). Such market power allegedly establishes that defendants' purported conspiracy "has the potential for genuine adverse effects." *Capital Imaging Assocs.*, 996 F.2d at 546 (citation and internal quotations omitted). Having failed to allege a plausible market, however, plaintiff clearly cannot demonstrate that defendants have sufficient market power. But, even if the Court were to assume that MPT employees constitute a plausible market and that defendants have sufficient market power, there is no "potential for genuine adverse effects" in this market. The courts of this Circuit, following the direction of the Supreme Court, regularly emphasize that, for an information exchange to have anticompetitive effects, the structure of the relevant market must be susceptible to the exercise of market power through tacit coordination. *See Battipaglia v. New York State Liquor Auth.*, 745 F.2d 166, 174–75 (2d Cir.1984) (Friendly, J.). Susceptible markets tend to be highly concentrated—that is, oligopolistic—and to have fungible products subject to inelastic demand. *See id.* (citing

---

**8.** Plaintiff contends that, even if she has not set forth a plausible relevant market, she can still survive a motion to dismiss by proving that defendants' salary exchange had "actual detrimental effects, such as a reduction of output." *FTC v. Indiana Fed. of Dentists*, 476 U.S. 447, 460, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (citations and internal quotations omitted). Detailed market analysis is unnecessary where detrimental effects have been shown or where some form of relevant market has been pleaded, *see Capital Imaging Assocs., P.C. v.*

*Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 546 (2d. Cir.1993) (citation omitted), but these detrimental effects must nevertheless be demonstrated. In this case, not only has plaintiff failed to plead a plausible relevant market, but she has also failed to provide anything more than conclusory allegations regarding actual detrimental effects on either the competition for MPT employees or herself individually. Thus, plaintiff's section 1 claim cannot proceed on the basis of "actual detrimental effects" that she pleads without supplying any of the requisite factual support.

various Supreme Court cases emphasizing these factors).

The alleged market here, however, is not, as plaintiff contends, so clearly oligopolistic. In fact, plaintiff identifies at least fourteen (14) companies—the defendants—that compete for MPT employees. According to the standard measure for determining market concentration, the federal government's merger guidelines, such a market is unconcentrated. *See* U.S. Dep't of Justice & Federal Trade Comm'n, *Horizontal Merger Guidelines,* § 2 (1992), *reprinted in* 4 Trade Reg. Rep. (CCH) ¶ 13,104. Moreover, even if the proposed market were oligopolistic, plaintiff still could not establish its susceptibility to the exercise of market power through tacit coordination. The "products" in her proposed market are, as discussed above, far from fungible. Additionally, plaintiff has pleaded no facts tending to establish that the demand for these "products" is inelastic. Accordingly, plaintiff cannot establish that defendants alleged agreement is likely to have anticompetitive effects and thereby cause her antitrust injury.

■ Finally, plaintiff's contention that defendants tacitly agreed to depress the wages of MPT employees is unpersuasive. At most, the Amended Complaint describes "conduct as consistent with permissible conduct as with [an] illegal conspiracy." *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Certainly the facts pleaded do not "tend[ ] to exclude the possibility that the [defendants] were acting independently." *Id.* at 764, 104 S.Ct. 1464. In short, plaintiff has not pleaded facts, as she must, that make it more likely than not that defendants acted in concert to restrain trade. Instead, the facts plaintiff pleads give rise to the more probable inference that each defendant oil company used the information exchanged to stake out an optimal competitive level for its MPT salaries. For instance, plaintiff notes that Exxon—the only company whose behavior she describes with any particularity in the Amended Complaint—maintained its salary levels 0.4% above the six majors but 3% below the high three. *See* 2d Amend.Compl. at ¶ 68. Plaintiff also acknowledges that Exxon's overall salary levels were always more than 100% of its competitors' salary levels. *See id.* at ¶ 89. Moreover, plaintiff emphasizes that Exxon's competitive factor decreased from 6.5% in 1991 to 0% in 1995. *See id.* at 109. However, as noted above, this decrease in the competitive factor indicates that Exxon was *raising* its salaries to meet the competition. Raising salary levels to meet the competition and attract highly qualified employees is certainly not evidence of a conspiracy to restrain trade; in fact, these alleged facts support the inference that the defendants were making independent business decisions.

The other Exxon salary setting behavior plaintiff describes is also plainly inconsistent with her allegations of a tacit conspiracy to depress the salaries of MPT employees. In particular, the decrease in Exxon's overall compensation level vis-à-vis its competitors from 110% to 107% does not lead reasonably to the conclusion that Exxon and the thirteen (13) other defendants had tacitly agreed to stabilize prices. The decrease in Exxon's overall salary structure is quite small and, in any event, is simply evidence of Exxon's ability to reduce its overall cost of paying its employees while simultaneously maintaining a competitive position in the oil industry. Section 1 "does not prohibit unilateral business decisions" of this sort. *World Arrow Tourism Enters., Ltd. v. TWA,* 582 F.Supp. 808, 810 (S.D.N.Y.1984). Moreover, no facts pleaded in the Amended Complaint suggest that Exxon's decision to gradually reduce its overall salary level was anything other than a unilateral business decision. In the final analysis, plain-

tiff's theory of the case is that fourteen (14) companies silently agreed[9] to use the MPT employee salary information that they exchanged (usually through an independent company, Towers Perrin, that kept the details of the salary information confidential, *see, e.g., id.* at ¶¶ 55, 69) to depress salary levels in a way that permitted Exxon, the six majors, and the high three to maintain their relative positions in the oil industry salary hierarchy and further allowed individual companies, such as Exxon, to reduce their competitive factor by raising salaries in certain categories to a more competitive level. A conspiracy of this sort lacks economic plausibility.

The FTC, the Department of Justice, and the United States Supreme Court, among others, all acknowledge the benefits that can, and often do, flow from the exchange of information among competitors. Granting plaintiff every reasonable inference in her favor, all that she claims is that Exxon and its co-defendants recognized these potential benefits and chose to pursue them through the various information exchanges plaintiff describes in her Amended Complaint. Plaintiff has failed to plead facts showing that the exchange of MPT employee salary information among defendants either was motivated by anticompetitive desires or resulted in anticompetitive effects. For this and the other reasons discussed above, the Court finds that plaintiff's Amended Complaint fails to plead facts sufficient to establish a section 1 claim and therefore must be dismissed.

## CONCLUSION

For the foregoing reasons defendants' motion to dismiss is hereby granted. The Clerk of the Court is hereby directed to close this action.

It is SO ORDERED.

9. Plaintiff's emphasis on the explicit assurances each defendant gave that the information exchanged would be used in setting MPT employee salaries does not amount to an allegation that the defendants had reached an express agreement to depress salaries. Indeed, all that plaintiff alleges is that the defendants relied on the salary information exchanged and that such "reliance ... facilitate[d] the tendency toward wage stability, thereby encouraging 'tacit' wage fixing." 2d Amend.Compl. at ¶ 104. However, the fact that each competitor chose to use that information for that purpose is not a rationally sufficient basis to support a claim of conspiratorial action.