**BURLINGTON COAT FACTORY WAREHOUSE, Plaintiff,**

v.

**BELK BROTHERS COMPANY, Belk Stores Buying Service, Inc., Jantzen, Inc., and White Stag Manufacturing Company, Defendants.**

No. 82 Civ. 3458(LBS).

United States District Court, S.D. New York.

Oct. 16, 1985.

Kassner, Haigney & Thompson, New York City, for plaintiff; Stacy J. Haigney, of counsel.

Donovan Leisure Newton & Irvine, New York City, for defendants Belk Bros. Co. and Belk Stores Buying Service, Inc.; Sanford M. Litvack, of counsel.

Sullivan & Cromwell, New York City, for defendant Jantzen, Inc.; William L. Farris, of counsel.

Kramer, Coleman & Rhine, New York City, for defendant White Stag Mfg.; Howard I. Rhine, of counsel.

ORDER

SAND, District Judge.

OPINION

Plaintiff, Burlington Coat Factory Warehouse ("Burlington") brought this action in May 1982 against the defendants Belk Brothers Company and Belk Stores Buying Service, Inc. (sometimes hereinafter referred to jointly as "The Belk defendants"),

Jantzen, Inc. ("Jantzen") and White Stag Manufacturing Company ("White Stag"). Burlington seeks damages based upon alleged violations of the federal antitrust law. Plaintiff alleges that defendants engaged in conduct constituting *per se* violations of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by forming contracts, combinations and conspiracies in restraint of trade for the purpose of (i) fixing and maintaining retail prices charged in the Charlotte, North Carolina area at or about the "keystone" level,[1] (ii) eliminating price competition in the Charlotte area, and (iii) driving Burlington's Charlotte store out of business by reason of its failure to adhere to said unlawful pricing policy. Defendants have moved for summary judgment pursuant to F.R.Civ.P. 56. In addition, defendant White Stag has moved for an award of attorney's fees and expenses pursuant to F.R.Civ.P. 11, section 1927 of the Judicial Code (28 U.S.C. § 1927), and the Court's general equitable powers. For the reasons detailed below, defendants Belk Brothers Company, Belk Stores Buying Service, Inc. and Jantzen are denied summary judgment. However, summary judgment is granted on behalf of defendant White Stag. This Court also grants defendant White Stag's motion for attorney's fees for the period commencing with plaintiff's filing of opposition papers to White Stag's motions.

## FACTS

Burlington is a New Jersey corporation that engages under its own name, Mode Craft Fashions, Sharon Sez, Inc. ("Sharon Sez"), and other names, in the wholesale purchase and retail sale of clothing. It operates at sixty-eight retail locations[2] in the eastern portion of the United States, including a store it owns and operates through a wholly-owned subsidiary in Charlotte, North Carolina. Burlington is characterized as an "off price" retailer or "dis-

counter" in the apparel industry because it follows a consistent policy of charging retail prices below the "key-stone" markup during non-sale periods.[3] Burlington attributes its success to its ability to offer first quality, brand-name merchandise at prices which are generally 25% below those charged by its competitors. Crippen Aff. ¶ 13.

Belk Brothers Company ("Belk Brothers") is a North Carolina corporation which owns and operates a chain of retail department stores. Three of Belk Brothers' fashion department stores are located in Charlotte, North Carolina. Furlong Aff. ¶ 2. Belk Stores Buying Services, Inc. ("Belk Services") provides services including merchandising assistance to Belk Brothers and other stores in the "Belk/Leggett" family of stores throughout the southeast. Crippen Aff. ¶ 4. Belk Services does not itself offer merchandise for sale to the public. Nipper Aff. ¶ 2.

Jantzen is a Nevada corporation that designs, produces and markets sportswear and swimwear for men and women. Farris Aff., Ex. C. It has design studios in New York, Los Angeles and Portland and manufacturing plants throughout the United States and Canada. *Id.* White Stag is an Oregon corporation that manufactures and sells women's sportswear at wholesale. Complaint at ¶ 11.

Belk Brothers is considered the largest retailer of apparel in the vicinity of Charlotte, North Carolina. Crippen Aff. ¶ 4. The procedure whereby Belk Brothers chooses its merchandise involves a list of recommended resources that is circulated among "Belk/Leggett" stores and seasonal trade shows it conducts in the Charlotte Merchandise Mart. Crippen Aff. ¶¶ 5, 7. Both placement on the recommended list and invitations to the seasonal trade shows are considered essential to a given manufacturer's opportunity to sell a large vol-

---

1. The term "keystone" level refers to the department store practice of selling merchandise during non-sale periods for double the wholesale price or slightly above (i.e., a 50% retail markup). Crippen Aff. ¶ 12.

2. At the time of the events which led to this lawsuit, Burlington operated only nineteen retail outlets. Complaint at ¶ 2.

3. *See* note 1 *supra.*

ume of goods to various "Belk/Leggett" stores. *Id.* at ¶¶ 6, 8. At all relevant times, the "Belk/Leggett" stores have purchased clothing from the manufacturing defendants, Jantzen and White Stag. Complaint ¶ 5.

### Jantzen

Burlington opened its Charlotte store in August, 1981. In the following months, it received shipments of apparel purchased from Jantzen and White Stag which it immediately sold at its low retail prices. Complaint ¶ 16. It is undisputed that Burlington obtained its merchandise from Jantzen through purchases under the auspices of Sharon Sez, a New York corporation which leased a women's sportswear department at four of Burlington's locations in New York and New Jersey. Farris Aff., Ex. O. The word "Burlington" was not used in either written or oral communication with Jantzen until November, 1981, but shipping instructions directed shipment to Mode Craft Fashions, the name under which Burlington apparently is known at the wholesale level. *Id.* White Stag also did its business with Sharon Sez, Mode Craft Fashions, and other "wholly owned subsidiaries of Burlington." White Stag's Memo. of Law, 2. In fact, Burlington has no "Burlington Coat Factory Warehouse" accounts and makes wholesale purchases solely under other names. Haigney Aff., Ex. A.

Burlington's entry into the Charlotte market was accompanied by the regular dispatch of Belk employees to Burlington's store to ascertain brands and prices. *See* Haigney Aff., Ex. C. In the fall of 1981, Jay H. Crippen, a former Jantzen sales representative in the Charlotte area, received a telephone call from Jantzen's regional sales manager, John Jenkins. Crippen Aff. ¶ 9. Mr. Jenkins informed Mr. Crippen that the merchandise manager for

Belk Stores, Edward J. Burke, had telephoned him to inquire as to whether it was Jantzen's policy to sell to "discounters." *Id.* Mr. Burke had further stated that if Jantzen continued to sell to discounters in the future, Belk Stores would look to other suppliers. *Id.*[4]

Before Mr. Burke's call, both Mr. Crippen and Mr. Jenkins were unaware that Jantzen merchandise was being sold by Burlington in Charlotte. *Id.* at ¶ 10. They subsequently learned that the merchandise had been purchased through Jantzen's New York office. Crippen Aff. ¶ 15. Mr. Arthur J. Brennan, Jantzen's men's apparel sales representative, had opened a menswear account in 1978 with Stephen A. Milstein under the auspices of Sharon Sez. *Id. See also* Farris Aff., Ex. M. Mr. Brennan admittedly failed to conduct the expected inquiry as to the suitability of the account, which would have included a visit to the actual retail outlets prior to filling any of the prospective customer's orders. Farris Aff., Ex. M. However, prior to 1978, Sharon Zellman had been purchasing Jantzen's women's sportswear under the Sharon Sez account. *Id.* at Ex. H; *see also* Crippen Aff. ¶ 15. Mr. Brennan advised Mr. Crippen that these women's sportswear sales assured him that the sales in question were not in conflict with any Jantzen policy. Crippen Aff. ¶¶ 15, 29.[5]

The parties disagree as to what prompted subsequent visits to Burlington's retail locations and the exact nature of the information sought from such visits. Burlington alleges that Mr. Burke's telephone call presented Jantzen with the devastating prospect of losing all of its "Belk/Leggett" business, the key to its profitability in the southeast. Crippen Aff. ¶ 10. Burlington further alleges that the sole purpose of an initial visit to its Charlotte store in the fall of 1981 was to ascertain Burlington pricing policies, *id.* at ¶ 10, and that the nature or

---

4. For purposes of this motion only, the Belk defendants accept this allegation as truthful. *See* Belk Defendants Statement Pursuant to Local Rule 3(g).

5. The Jantzen sales representative that opened the women's sportswear account with Sharon Sez was Ken Gritch. Farris Aff., Ex. H. Whether or not Mr. Gritch visited the prospective retail outlet or failed to fulfill his duty is not discussed by either party.

appearance of the store was irrelevant. *Id.* at ¶ 11.

Jantzen alleges that a substantially large order in October, 1981, from Sharon Sez prompted an inquiry by Mr. Brennan. Farris Aff., Ex. M. Mr. Brennan realized through several phone calls and a visit to the account's Paramus, New Jersey store that Mode Craft was really Burlington Coat Factory Warehouse. *Id.* Prior to this order, Jantzen had continually shipped to Sharon Sez and Mode Craft and these accounts respectively had maintained a good credit standing. *Id.*[6]

Jantzen management in Portland, Oregon followed up in early 1982 by asking for written reports on each of plaintiff's stores. Ludeman Aff. ¶ 6. Mr. Don W. Fish, the now deceased National Sales Manager who ordered these reports, made a decision to terminate the Sharon Sez account because the Burlington stores did not satisfy Jantzen's customer criteria. *Id.*[7] Jantzen maintains that it wants its apparel sold in department and specialty stores "that through reputation, fashion advertising and such amenities as attractive displays and fixtures[,] present Jantzen apparel as fashion rather than commodity." *Id.* at ¶ 4. Its only exception to this policy involves areas where such retail stores do not exist or in which Jantzen has been unsuccessful in establishing its lines. *Id.* at ¶ 5. Burlington, which described itself as a "factory warehouse" and adhered to a "no frills" approach in presenting its merchandise, *id.* at ¶ 6, did not fulfill Jantzen's distributional objectives.

Burlington alleges that the quality of Burlington's stores had nothing to do with either these subsequent visits or its ultimate termination. On January 28, 1982, Mr. Steven Koster, the Burlington buyer in charge of the account, met with Art Brennan and Dennis Maloney, Jantzen's Eastern Regional Manager. Farris Aff., Ex. E. Plaintiff alleges that Mr. Koster was told about complaints from the south, specifically from Belk Stores,[8] regarding Jantzen's merchandise being sold "off price." *Id.* On February 22, 1982, Mr. Koster spoke with Mr. Maloney over the telephone about the same dilemma. Farris Aff., Ex. F. Mr. Maloney's statements in this conversation included "we're not looking for the type of distribution that is going to run our goods off price day in and day out and that's, that is the problem ..." and "that [Belk] is obviously the big thing, because that's our biggest account in the country so that's got to be a part of it." *Id.*[9] Plaintiff alleges that these communications indicate Jantzen's only concern regarding Burlington was its pricing policy and that this concern was cultivated by Belk's threat to seek other suppliers for its merchandise. Crippen Aff. ¶ 13. Burlington further alleges that certain Jantzen representatives expressed deep satisfaction with Burlington's stores, Haigney Aff., Ex. M,[10] and that

6. Mr. Brennan subsequently sent an inter-office memorandum to Dennis Maloney, Jantzen's Eastern Regional Manager, on November 21, 1981. Farris Aff., Ex. D. The memorandum described his discovery, the brands he had spotted in both Burlington's Paramus, New Jersey and Copiague, Long Island stores, and the fact that they were "Brand Discounters." *Id.*

7. According to Burlington, Jantzen first informed plaintiff that it would not fill its additional orders for the spring merchandising season and would in all probability refuse to make further sales to plaintiff on or about February 22, 1982. Complaint at ¶¶ 27–28. Jantzen then allegedly undertook and failed to fill Burlington's spring orders. *Id.* at ¶ 28. On or about April 30, 1982, Jantzen allegedly told Burlington it would no longer sell to Burlington's stores in the future. *Id.* at ¶ 29.

8. Plaintiff also mentioned complaints from an unnamed retailer in Hartford, Connecticut. Farris Aff., Ex. E.

9. For purposes of this motion only, both the Belk defendants and Jantzen assume that these statements were in fact made by Mr. Maloney. However, Jantzen contends that Mr. Maloney's final statement "I don't think so" in response to Mr. Koster's question as to whether it would help if Burlington "brought it in at regular price and had periodic sales" indicates that Jantzen never sought to raise its resale prices.

10. Mr. Michael Wrann, the Jantzen sales representative who allegedly made the complimentary remarks about a Burlington store, recounts his report to Jantzen differently. Mr. Wrann alleges he told Jantzen that "the image [of Burlington] is more discount/outlet type rather

Jantzen maintained accounts with far less attractive clothing establishments than Burlington where no nearby Belk/Leggett stores threatened Jantzen with the loss of its business. Crippen Aff. ¶¶ 26–27.

Jantzen maintains that it always has left retail prices to the discretion of its customers, simply suggested retail prices for garments it sells as a matter of customer convenience, Ludeman Aff. ¶ 2, and never sought to induce plaintiff to raise its resale prices.[11] Although Burlington alleges that Belk Brothers' store in Charlotte consistently followed the "keystone" markup with respect to Jantzen merchandise during non-sale periods, Crippen Aff. ¶ 13, defendant Belk Brothers claims it does not adhere to any system whereby prices are marked up to a fixed percentage over cost and has no agreement with any manufacturer in that regard. Furlong Aff. ¶ 4.

### White Stag

Beginning in the late 1970's, White Stag sold merchandise to Burlington [12] for resale in various Burlington stores throughout the country. In January, 1982, Mr. Louis Gale, White Stag's Eastern Sales Manager, informed Norman Ross, General Merchandise Manager of Burlington, and Sharon Zellman that White Stag would no longer sell merchandise to Burlington. Haigney Aff., Ex. N; Weinstein Aff. ¶ 7. White Stag subsequently agreed to continue selling merchandise to certain Burlington locations, not including Charlotte. Weinstein Aff. ¶¶ 9–11. White Stag stopped dealing

with Burlington entirely once the plaintiff commenced this lawsuit. *Id.* at ¶ 14.

Plaintiff alleges that White Stag's decision not to ship to Charlotte and other Burlington locations was premised on the fact that Burlington was an off-price customer and that White Stag had received pressure from full price customers in those geographical areas. Haigney Affidavit, Exs. H & K. Burlington further explains that Mr. Gale could offer no justification for the termination, was obviously upset by it, and had instructions to use "marvelous legal terminology" when he met with Mr. Ross and Ms. Zellman. Haigney Aff., Exs. H & N.[13]

The only evidence proffered by Burlington that links White Stag with the Belk defendants is a conversation Mr. Jeffrey Appleman, Burlington's Charlotte store manager, had with a bank branch manager of the United Carolina Bank in Charlotte, Lynn Funderburk. Ms. Funderburk informed Mr. Appleman that she had a friend with a close personal relationship with White Stag's local salesman and her friend was advised that Belk had cancelled an order for White Stag merchandise because White Stag's goods were sold in plaintiff's store. Rhine Aff., Exs. B. Furthermore, a letter dated April 15, 1985, from Kive Weinstein, then Vice President and Director of Marketing for the Sportswear and Outerwear Division of White Stag, to Gene Hayes, White Stag's salesman in Charlotte, stated, "Now that we have eliminated Burlington Coat from your backyard, please eliminate Burlington Industries' Factory

---

than fashion store appearance" and that "the volume we can generate at this time from this account, although substantial, may well be offset in the future by our department stores and specialty accounts whose business is affected by the presen[ce] of Jantzen merchandise in such an operation." Farris Reply Aff., Ex. I.

**11.** Jantzen further alleges that assuming for purposes of this motion only that Mr. Maloney in fact made the statements alleged by plaintiff, *see* text accompanying notes 8–9 *supra,* they represent nothing more than a unilateral policy adopted by Jantzen in complete accord with the *Colgate* doctrine. See pp. 231–32 *infra.*

**12.** White Stag did business with Burlington's wholly owned subsidiaries—Sharon Sez, Mode Craft Fashions, PNN, Ltd., Penn Plaza Fashions, and Penn Fashions, Inc. White Stag Memo. of Law at 2. However, White Stag makes no argument that it was unaware of the identity of the retail stores to which its merchandise was being shipped.

**13.** Mr. Gale alleges that his mood was due to the fact that he was upset over the death of Ms. Zellman's husband and knew he would himself lose income because of the termination. He also does not recall using the term "marvelous legal terminology." Haigney Aff., Ex. H.

Outlet in Manhattan from that most prime and prestigious marketing area. Like effective now!" Haigney Aff., Ex. K. As stated in plaintiff's memorandum of law, "[g]iven Belk Stores' track record *vis-a-vis* Jantzen's dealings with Burlington ..., the inference is inescapable that the source of such pressure was the Belk defendants." Burlington's Memo. of Law at 22–23.

White Stag alleges that Mr. Weinstein made a unilateral decision to discontinue selling to Burlington and had not discussed the matter with anyone (including Mr. Gale or any Belk representative) prior to making his decision. Weinstein Aff., ¶¶ 2, 12. Mr. Weinstein's original decision to terminate all Burlington accounts was based on the fact that White Stag was trying to become a more fashionable line in the moderate price range and should look to sell to the most prestigious fashion stores in each state. *Id.* at ¶ 5. When he decided to sell to certain Burlington locations, he based his decision on such criteria as how big White Stag's distribution was in a particular area, the size of the area, and his sense of the general tenor of the marketplace in each area. *Id.* at ¶ 10. Charlotte was eliminated because White Stag's customer base there was a specialty store base which he judged to be near the saturation point. *Id.* at ¶ 11. White Stag urges that as with his original decision to entirely terminate Burlington, Weinstein's decision to eliminate certain stores was unilateral. *Id.* at ¶ 12.

## DISCUSSION

### I. *Summary Judgment*

■ Summary judgment may be granted only when it appears to a court that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c). However, in antitrust matters, summary judgment should be granted sparingly, "especially where an allegation of conspiracy raises issues of fact as to motive and intent." *Reborn Enterprises, Inc. v. Fine Child, Inc.,* 590 F.Supp. 1423, 1435 (S.D.N.Y.1984), *aff'd,* 754 F.2d

1072 (2d Cir.1985), (citing *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554–55 (2d Cir.1977)). Nevertheless, summary judgment is appropriate in some antitrust cases. *See, e.g., First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 274–88, 88 S.Ct. 1575, 1585–92, 20 L.Ed.2d 569 (1968). In determining whether to grant summary judgment, "the court must resolve all ambiguities and draw all reasonable inferences against the moving party." *Katz v. Goodyear Tire and Rubber Co.,* 737 F.2d 238, 244 (2d Cir.1984). Summary judgment is inappropriate where the resisting party "comes forth with affidavits or other material ... that generates uncertainty as to the true state of any material fact...." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). It is not the court's role at this moment to *try* issues of fact; rather, it must determine whether there *are* issues of fact to be tried. *See Empire Electronics Co. v. United States,* 311 F.2d 175, 179 (2d Cir.1962) (emphasis in original). When the court is persuaded that the suit can have only one possible outcome, summary judgment should be granted. *See Reliance Insurance Co. v. Barron's,* 442 F.Supp. 1341, 1343–44 (S.D.N.Y.1977).

### II. *Sherman Act § 1 Conspiracies*

■ Section 1 of the Sherman Act states in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (1985). The essence of a Section 1 claim is concerted action. *Terry's Floor Fashions v. Burlington Industries, Inc.,* 763 F.2d 604, 610 (4th Cir. 1985). The Supreme Court recently has reiterated a manufacturer's right "to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Mon-*

*santo Co. v. Spray-Rite Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775, *reh'g denied*, —— U.S. ——, 104 S.Ct. 2378, 80 L.Ed.2d 850 (1984) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)). In *Monsanto*, the Supreme Court also reemphasized another important distinction in distributor-termination cases between concerted action to set prices and concerted action regarding nonprice restrictions. *Id.* The former are *per se* illegal because of "their pernicious effect on competition and lack of any redeeming virtue," *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), and thereby subject to treble damages. The latter are governed by a rule of reason that "requires a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition." *Monsanto*, 104 S.Ct. at 1469 (citing *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)).[14] The instant distributor-termination case involves an alleged claim of concerted action to set prices and thus is subject to per se treatment and treble damages. *Monsanto*, 104 S.Ct. at 1470.

Since unilateral action is not proscribed, "[t]he starting point for proof of a section 1 violation is evidence of a contract, combination, or conspiracy between two or more persons." *Reborn*, 590 F.Supp. at 1436; *see also Schwimmer v. Sony Corp. of America*, 677 F.2d 946, 952 (2d Cir.1982).

However, conspiracies are not easy to prove because they are rarely evidenced by explicit agreements. Although a plaintiff may rely on inferences "fairly ... drawn from the behavior of the alleged conspirators," *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976), the Supreme Court has warned against drawing conclusions from "highly ambiguous evidence" because of the "considerable danger that the doctrines enunciated in *Sylvania* and *Colgate* w[ill] be seriously eroded." *Monsanto*, 104 S.Ct. at 1470.

In *Monsanto*, the Supreme Court articulated that the proof necessary to permit the inference of a conspiracy in distributor-termination cases must go beyond evidence of complaints. *Id.* at 1471. The Court explicitly denied any suggestion that evidence of complaints has no probative value at all. *Id.* at n. 8. However, since complaints are a natural and legitimate source of information for manufacturers, "[p]ermitting an agreement to be inferred merely from [their] existence ..., or even from the fact that termination came about 'in response'" thereto, could deter or penalize perfectly legitimate conduct. *Id.* at 1440. The burden thus remains on the plaintiff "to introduce evidence sufficient to support a finding of an unlawful contract, combination or conspiracy." *Id.*

■ The antitrust plaintiff therefore must produce "something more than evidence of complaints."[15] To show concert-

14. Although the Supreme Court admitted that this distinction was difficult to apply in practice, the Court declined to reach the question of whether the rule of reason should apply to a vertical price-fixing agreement. *See Monsanto*, 104 S.Ct. at 1469 n. 7.

15. Some commentators have remarked that the Court in *Monsanto* did not adequately flesh out this additional requirement. *See generally* Calvani & Berg, *Resale Price Maintenance After Monsanto: A Doctrine Still At War With Itself*, 1984 Duke L.J. 1163; Hay, *Vertical Restraints After Monsanto*, 70 Cornell L.R. 418 (1985). In the context of *Monsanto*, the Court found two items of evidence sufficient to generate a triable issue—(a) a different distributor/discounter had been ad-

vised that termination would occur if the discounter did not observe the suggested resale price; the defendant went to the discounter's parent company when the discounter himself did not assent, and the parent thereafter instructed its subsidiary to comply; (b) a newspaper prepared by a distributor for its dealers reported that defendant's officials had noted their desire to "'get the market place in order'" and to employ "'every effort ... to maintain a minimum market price level.'" *Monsanto*, 104 S.Ct. at 1471. The first incident occurred five months after the plaintiff had been terminated and the second arguably could be interpreted as examining defendant's policy of suggested retail prices in full compliance with *Colgate, see* Calvani & Berg, *supra*;

ed action, he must advance "evidence which tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.* at 1471; *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 923 (2d Cir.1985). That is, he should "present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme to achieve an unlawful objective'." *Monsanto,* 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3rd Cir.1980) *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)).

### A. Alleged Conspiracy Between Jantzen and the Belk defendants.

Burlington's claim of concerted action in relation to the Belk defendants and Jantzen rests on the following:

(a) Mr. Ed Burke's statement to Mr. John Jenkins that if Jantzen continued to sell to discounters, Belk Stores would look to other suppliers.

(b) Statements by Dennis Maloney to Burlington buyer Steven Koster that Jantzen could not consistently run its goods off-price and that Belk, its biggest account in the country, had complained and therefore was obviously a big part of the problem.

(c) The fact that Jantzen's distributional policies were a non-issue prior to facing the loss of one of its largest accounts; moreover, (i) that Jantzen's original analysis of its Burlington account focused solely on plaintiff's pricing policies; (ii) on inspection, Jantzen had found Burlington's stores to be entirely satisfactory; and (iii) Jantzen continued to maintain accounts with less attractive stores in areas where the Belk defendants did not retail.

(d) When a Belk representative had complained about another discounter marketing Jantzen merchandise (The Garment District, Inc., Gastonia, North Carolina), Mr. Jenkins agreed to terminate the Garment District account.[16] Crippen Aff. ¶¶ 21–22. Belk had stopped inviting Jantzen to its trade shows and had threatened that Jantzen would lose all of its business with its various Belk/Leggett accounts if it sold to this discounter. *Id.* at ¶¶ 20–21.[17]

■ Both the Belk defendants and Jantzen allege that Burlington has failed to produce evidence of a conspiracy or agreement to fix or maintain resale prices.[18] The defendants contend that Burlington has proffered nothing more than "complaint" evidence, "explicitly rejected" by the Supreme Court in *Monsanto,* and that plaintiff's fate was entirely the result of the manufacturer's independent business judgment not to sell its goods in a "pipe

---

at 1195–96, leading certain observers to believe "that the Court's treatment of the facts in *Monsanto* was inconsistent with the tenor of its rhetoric." *Id.* at 1197.

**16.** That matter has been separately litigated. *See Garment District, Inc. v. Belk Stores Services, Inc.,* 617 F.Supp. 944 (W.D.N.C.1985).

**17.** In that situation, Jantzen had been reluctant to continue its sales to the Belk store in question when the store put Jantzen merchandise in its bargain basement. The store took this action upon learning of Jantzen's commitment to sell to a discounter. Crippen Aff., ¶¶ 20–21. Mr. Crippen received a copy of the letter Mr. Jenkins sent to Bob Smith of Belk to inform the latter that Jantzen would rectify this situation. *Id.* at ¶ 22. Mr. Crippen states he was told by

Mr. Jenkins to destroy this letter, who in turn had been instructed to do so by Mr. Smith. *Id.* at ¶ 24. Mr. Crippen nonetheless retained a photostat. Haigney Aff., Ex. B.

**18.** The rationale underlying Section 1 of the Sherman Act is of course that society benefits from free competition. Such competition is as impaired by explicit price-fixing agreements as it is by arrangements between competitors that have an identical impact and intent such as the coerced exclusion of discount rivals from the market place solely because of their pricing policies. *See generally Jeanery, Inc. v. James Jean, Inc.,* 1984–2 TRADE CAS. (CCH) ¶ 66,278 (D.Ore. Oct. 1, 1984); *see also generally Reborn, supra,* 590 F.Supp. 1423; *Computer Place, Inc. v. Hewlett-Packard Co.,* 1984–2 TRADE CAS. (CCH) ¶ 66,254 (N.D.Cal. Oct. 22, 1984).

rack, grocery-store-checkout-type-store." Litvack Aff., Ex. H.

Viewing the evidence in the light most favorable to the plaintiff, this Court finds that neither the Belk defendants nor Jantzen are entitled to summary judgment. We find this case to be similar to *Jeanery, Inc. v. James Jeans, Inc.*, 1984–2 TRADE CAS. (CCH) ¶ 66,278 (D.Ore. Oct. 1, 1984). In *Jeanery*, a manufacturer was pressured by a competing retailer to choose between losing the competitor's account or continuing sales to a discounter. *Id.* at 66,208. The *Jeanery* Court found that this testimony went "beyond the fact that complaints were received and termination occurred and provid[ed] direct evidence from which a jury could find 'a unity of purpose or common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Id.* at 67,209 (quoting *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)). On this evidence, coupled with testimony regarding subsequent discussions and consideration by the manufacturer of terminating the discounter in direct response to the competitor's threats, the *Jeanery* Court denied manufacturer's motion for summary judgment. *Id.* at 67,208–09. The Court noted that other evidence that the manufacturer wanted retailers to price their merchandise at full keystone mark-up, retailers generally complied, and other distributors had complained about the discounter, would have been "insufficient alone to support an inference of conspiracy under [*Monsanto* ]." *Id.* at 67,208.

■ We find the evidence proffered by Burlington to mirror that on which the *Jeanery* Court based its denial of summary judgment. As such, this evidence could lead a jury to conclude that Jantzen's refusal to deal with Burlington stemmed not from Jantzen's unilateral and independent decision, but from defendants' "conscious commitment to [the] common scheme" of excluding Burlington from competition with Belk Stores in retailing Jantzen merchandise. *See Terry's Floor Fashions v. Burlington Industries, Inc., supra*, 763 F.2d at 616 (Winter, J., concurring) (quoting *Monsanto*, 104 S.Ct. at 1471). This is particularly so given evidence proffered by plaintiff regarding Jantzen's failure to adhere to its distribution policies prior to the Belk defendants' complaints,[19] its alleged satisfaction with both Burlington's attributes as a retail outlet and its credit lines, and Jantzen's maintenance of accounts with less attractive stores in locations where Belk did not retail.[20]

The instant case can therefore be distinguished from other cases within this circuit where summary judgment has been granted to defendants sued under Section 1 of the Sherman Act. In *Burlington Coat Factory Warehouse v. Esprit De Corp., supra*, for example, there was no evidence that the manufacturer and the nonterminated distributor had ever discussed Burlington's discounting. *See* at 923. The Second Circuit also noted in *Esprit* that while the manufacturer had not disclosed its marketing requirements to the plaintiff until after cancellation, "the existence of the plan was of crucial importance in *Monsanto* because there was evidence of complaints by competing retailers, evidence lacking in the present case." *Id.* at 924. In the instant case, there *is* evidence of complaints by a competing retailer, making Jantzen's failure to disclose its marketing strategy prior to these complaints and subsequent termination still of "crucial importance."[21]

---

**19.** It also is noteworthy that Jantzen never discussed its distribution policies with Burlington prior to Belk's complaints and the subsequent termination. *See Monsanto*, 104 S.Ct. at 1472; *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., supra*, 769 F.2d at 924, and text accompanying note 21 *infra*.

**20.** *Compare Jeanery, supra*, with *Computer Place, Inc. v. Hewlett-Packard Co.*, 1984–2 TRADE CAS. (CCH) ¶ 66,254 (N.D.Cal. Oct. 22, 1984) (summary judgment granted where only evidence linking nonterminated distributors and manufacturers was dealers' complaints about "free riding" in marketing surveys issued by manufacturer and various "isolated and ambiguous memoranda;" no complaints about price-discounting were received). *See also* Calvani & Berg, *supra* note 15, at 1199–1203.

The *Esprit* opinion noted that evidence presented in *Reborn Enterprises, Inc. v. Fine Child, Inc., supra,* another distributor-termination case in which summary judgment was granted, was even more persuasive than that offered in *Esprit.* The evidence in *Reborn* consisted of "(1) direct complaints by competing retailers to the manufacturer about the plaintiff's discounting; (2) pressure from the manufacturer to follow a suggested retail price; [and] (3) complaints from the manufacturer to the plaintiff regarding the plaintiff's discounting." *Esprit,* at 924 (citing *Reborn,* 590 F.Supp. at 1432–34). However, no one ever had threatened to stop buying from the manufacturer unless the discounter was terminated. *Reborn,* 590 F.Supp. at 1433.

Although the absence of such pressure to terminate a discounter is enough to distinguish the instant case from *Reborn,* the following factors also are noteworthy: the manufacturer in *Reborn* had been reluctant from the start to deal with the terminated distributor because of the manufacturer's policy of selling only to juvenile goods shops; the terminated distributor had breached his initial agreement not to sell the product from his Upper East Side store; the manufacturer never threatened to terminate the distributor's account for discounting; and the terminated distributor had displayed "uncontrolled conduct and shoddy practices" throughout his business relationship with the manufacturer. *Id.* at 1431–52.

This Court is of the opinion that the instant case, unlike *Reborn,* arguably contains factual support for Burlington's legal contentions regarding Jantzen and the Belk defendants. *See id.* at 1452. Thus, this Court is "satisfied that a properly instructed jury, giving full weight to plaintiff's evidence, drawing every reasonable inference in its favor, and subjecting defendants' evidence to a critical eye, could ... rationally ... f[i]nd that [the] plaintiff was entitled to [some form of] relief." [22] *Ambrook Enterprises v. Time, Inc.,* 612 F.2d 604, 611 (2d Cir.1979), *cert. dismissed,* 448 U.S. 914, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980). As such, the Belk defendants' motion for summary judgment and Jantzen's motion for summary judgment are denied.[23]

---

**21.** Despite Jantzen's allegations that it did not know it was selling merchandise to Burlington prior to Mr. Brennan's inquiry into an unusually large order, the fact remains that Jantzen failed to visit the Sharon Sez retail outlets prior to signing on the account. It therefore was in conflict with its own stated distribution policies from the outset, policies which plaintiff had no awareness of prior to cancellation. Moreover, plaintiff alleges that initial visitations were either for the sole purpose of determining Burlington's prices or indicated satisfaction with Burlington's stores. Even if the Court assumes that Jantzen legitimately was unaware of its dealings with Burlington at a prior point in time. The "independence" of its termination decision and the correlation between its proffered rationale and its prior actions remain questionable.

**22.** This Court also notes that what has been referred to as the strongest evidence of a contract, combination or conspiracy presented in *Monsanto* clearly is present in the instant case—defendant's acknowledgment to plaintiff of the receipt of complaints about plaintiff's pricing policies. See Calvani & Berg, *supra* note 15, at 1196–97. Moreover, in *Monsanto,* there was no direct evidence of a causal link between these complaints and termination. *Id.* at 1197. In the instant case, plaintiff alleges that the Belk defendants threatened to cut off their Jantzen account if Jantzen did not terminate Burlington. Finally, in *Monsanto,* there was no direct evidence of complaints from competing distributors about plaintiff's pricing policies during the fifteen months prior to termination. *See* 104 S.Ct. at 1473 n. 14. In the instant case, plaintiff alleges that these complaints occurred around six months before its termination.

**23.** Defendants also rely on *Terry's Floor Fashions, Inc. v. Burlington Industries, supra,* 763 F.2d 604 and *Landmark Development Corp. v. Chambers Corp.,* 752 F.2d 369 (9th Cir.1985), in support of their respective motions for summary judgment. Neither *Terry's Floor Fashions* nor *Landmark Development Corp.,* however, involve allegations that a competing retailer threatened to close out the manufacturer if the latter did not terminate sales to a discounter. As such, this Court feels no further distinctions are necessary.

For the same reason, this Court is not persuaded by defendants' reliance on *Schwimmer*

**B. Alleged Conspiracy Between White Stag and the Belk defendants.**

■ Defendant White Stag alleges that there is no evidentiary support for Burlington's claim of conspiracy between White Stag and the Belk defendants and that plaintiff has failed to adduce evidence of *any* communications between Belk and White Stag with respect to Burlington. This Court agrees. As noted by White Stag, plaintiff's response to defendant's First Set of Interrogatories indicated that its entire factual basis for a claim against White Stag rested on a "highly attenuated daisy chain of unsupported inferences." White Stag's Memo. of Law at 9. This "daisy chain" presents its weakest link in the statement allegedly made by Lynn Funderburk to Mr. Appleman regarding what a friend of a friend had told her about White Stag's decision to terminate Burlington. *See* text at 230, *supra*. Not only is hearsay evidence inadmissible and outside the realm of judicial consideration on a motion for summary judgment, *see Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 667 (9th Cir.1980), the remaining evidence proffered by Burlington does no more than "whet the curiosity of the Court" as to any colorable claim against White Stag. *Applegate v. Top Associates, Inc.*, 425 F.2d 92, 96 (2d Cir.1970). Plaintiff's interpretations of Lou Gale's comments to Burlington's representatives, Mr. Weinstein's letter to Gene Hayes, and in-ternal memoranda passed between White Stag personnel, the only other evidence upon which plaintiff relies, *see* text at 230–31 and accompanying notes, *supra*, provide nothing more than conjecture and "conclusory allegations." *Samuels v. Eleonora Beheer, B.V.*, 500 F.Supp. 1357, 1364 (S.D.N.Y.1980), *aff'd.*, 661 F.2d 907 (2d Cir.1981). Neither is sufficient to defeat summary judgment, even where plaintiff has set out "to unveil a shadowy and elusive conspiracy." *Id.*

Plaintiff admits the paucity of its evidence against White Stag when it relies on "Belk Stores' track record *vis-a-vis* Jantzen's dealings with Burlington and the Garment District" to draw its "inescapable inference." Burlington's Memo. of Law at 22–23. Nothing the plaintiff suggests comes close to "present[ing] direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme to achieve an unlawful objective.' " *Monsanto, supra*, 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, supra*, 637 F.2d at 111). White Stag's motion for summary judgment therefore is granted.[24]

**III. *White Stag's Application for Attorney's Fees***

White Stag bases its application for attorney's fees on Rule 11 of the Federal Rules of Civil Procedure,[25] Section 1927 of

---

*v. Sony Corp. of America*, 677 F.2d 946 (2d Cir.1982) or *H.L. Moore Drug Exchange v. Eli Lilly and Co.*, 662 F.2d 935 (2d Cir.), *cert. denied* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1981).

**24.** Because of plaintiff's failure to produce even evidence of some communication between the Belk defendants and White Stag, this Court need not address White Stag's alleged reasons for terminating Burlington. As noted by the Second Circuit in *H.L. Moore Drug Exchange v. Eli Lilly & Co., supra*, 662 F.2d at 941, a manufacturer who acts independently cannot violate any legal obligation he has to a retailer. *See also Edward J. Sweeney & Son, Inc. v. Texaco, Inc., supra*, 637 F.2d at 110 (3rd Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981) ("Unilateral action, no matter what its motivation, cannot violate § 1.").

This Court also notes plaintiff's request that it exercise its discretion to defer judgment pending the outcome of a current FTC investigation. The Second Circuit has stated that "[a]n opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of a motion." *Contemporary Mission, Inc. v. U.S. Postal Service*, 648 F.2d 97, 107 (2d Cir.1981) (quoting *Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 344 (9th Cir.1978) ). In any event, the time which has elapsed between the commencement of this action and the determination of this motion already has afforded plaintiff any deferral to which it is entitled.

**25.** Rule 11 states in pertinent part:
The signature of an attorney or party constitutes a certificate by him that he has read the

the Judicial Code (28 U.S.C. § 1927),[26] and the Court's general equitable powers. On any and all of these grounds, White Stag alleges that Burlington lacked a well-founded basis for both bringing and maintaining its antitrust claim against White Stag.

As already indicated, plaintiff named White Stag "as a defendant on the basis of hearsay and rumor of a most tenuous nature." *Miller v. Schweickart*, 413 F.Supp. 1059, 1061 (S.D.N.Y.1976). White Stag contends that plaintiff's subsequent discovery efforts either lacked vigor or failed to reveal any more tangible evidence to substantiate Burlington's antitrust claim. For example, Burlington's only effort to "open communications" with Ms. Funderburk was a telephone call to its Charlotte store manager in which it was advised that "since Burlington had transferred its bank account to another bank in Charlotte, the woman in question refused to discuss anything with him." Haigney Supp. Aff. ¶ 34. White Stag further alleges that plaintiff made no effort to depose Mr. Kive Weinstein, the person who made the decision to terminate Burlington, and limited its depositions to Lou Gale and two Belk personnel who had no dealings with White Stag.

Burlington counters these accusations with the allegation that White Stag was inordinately delinquent in responding to its interrogatories and discovery requests. *See id.* at ¶¶ 37–38. Plaintiff's response to White Stag's contention that once it ad-

vised plaintiff it possessed a sworn affidavit from Ms. Funderburk stating she had no familiarity with the facts involved in the lawsuit, Rhine Reply Aff., Ex. A, plaintiff should have "confirm[ed], discredit[ed] or discontinue[d]" the lawsuit, Rhine Supp. Aff. ¶ 9 and Ex. B, is that the documents it received from White Stag were incriminating enough to serve as a basis for the denial of summary judgment. *See* Haigney, Supp. Aff. ¶ 38; *see also* Haigney Aff., Exs. H & K. Moreover, even if this Court would not find such documents sufficient, Burlington alleges that the lateness of White Stag's responses "disposes of any notion that Burlington kept White Stag in this action for an unwarranted period of time." Haigney Supp. Aff. ¶ 39.[27]

The prevailing American rule that the successful litigant may not recover his attorney's fees from the losing party has certain recognized exceptions. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975). The "bad faith" exception enables a court acting within its inherent equitable powers to award fees where one party has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Id.* at 258–59, 95 S.Ct. at 1622 (quoting *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)).[28] The Second Circuit

---

pleading, motion, or other paper; that to the best of his knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith agreement for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or cause delay or needless increase on the cost of litigation.

**26.** Section 1927 provides, in part, that "any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the Court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927 (1985).

**27.** Burlington also asserts that White Stag's refusal to accept plaintiff's "reasonable offer" indi-

cates that it is the defendant who has unduly prolonged this litigation. Plaintiff had agreed to permit entry of summary judgment in favor of White Stag and to provide a statement exonerating White Stag from any wrongdoing *provided* White Stag would forego its attorney's fees claims. Haigney Supp. Aff. ¶ 4–13, Rhine Supp. Aff. ¶ 3–6. This left White Stag with a choice between surrendering any rights it may have had to impose sanctions on the plaintiff or moving for summary judgment. *See Viola Sportswear, Inc. v. Mimun*, 574 F.Supp. 619, 620 (E.D.N.Y.1983). Given these options, this Court cannot punish White Stag for its chosen alternative.

**28.** This exception applies to a party's conduct prior to as well as during the course of litigation. *See Hall v. Cole*, 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973).

has called for "'clear evidence' that the claims are 'entirely without color *and* made for reasons of harassment or delay or for other improper purposes.'" *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir.1985) (quoting *Browning Debenture Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1088 (2d Cir.1977)).

▮ It is this Court's conclusion that with respect to plaintiff's *commencement* of this action against White Stag, this standard is not met. For purposes of the bad faith exception, "[a] claim is colorable ... when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir.1980). Although plaintiff's claim against White Stag proved to be unfounded, "one cannot safely say that no 'reasonable attorney could have concluded that facts supporting the claim *might be established.*'" *Gianna Enterprises v. Miss World (Jersey) Ltd.*, 551 F.Supp. 1348, 1359 (S.D.N.Y.1982) (quoting *Nemeroff, supra*, 620 F.2d at 348 (emphasis in original)). Belk's collusion with another manufacturer could not substitute for plausible evidence against White Stag but the following factors could have led plaintiff's attorney in good faith to conclude that an antitrust claim was suggested: the timing of White Stag's termination of Burlington at or about the time that the latter was terminated by Jantzen; the absence of a definitive explanation for White Stag's termination; and White Stag's persistent refusal to supply Burlington's Charlotte store.

▮ Moreover, no clear evidence exists that plaintiff raised this claim in bad faith or for an improper purpose. *See PRC Har-*

ris, Inc. v. Boeing Co., 700 F.2d 894, 898 (2d Cir.), *cert. denied* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). Since "intentional abuse of the judicial process ... is the target of protective awards of attorneys' fees," *Gianna Enterprises, supra*, 551 F.Supp. at 1360, a showing of egregious conduct is necessary. In *Tedeschi v. Smith, Barney, Harris Upham & Co., Inc.*, 579 F.Supp. 657, 661–62 (S.D.N.Y. 1984), *aff'd*, 757 F.2d 465 (2d Cir.1985), Judge Weinfeld determined that the following combination of factors amounted to a finding of bad faith: claims that were "patently without substance and color of law;" the flagrant behavior of plaintiff's attorney who knew these claims were groundless because he represented plaintiff at the arbitration proceeding from which they derived and therefore did not have to rely on as yet unestablished information from his client; and a "reckless and mendacious allegation" levelled against defendant's counsel for which the Court had previously reprimanded plaintiff. This court cannot say that Burlington commenced the instant suit in such a manner.

Since the Court's power to award fees pursuant to Section 1927 is "guided by [a] similar if not identical standard," *Gianna Enterprises*, 551 F.Supp. at 1359, this Court also withholds an award of attorney's fees from the commencement of this action to White Stag under Section 1927.[29] Moreover, the old Rule 11, which was effective when plaintiff filed this action against White Stag on May 26, 1982, likewise required a showing of bad faith prior to the imposition of sanctions. *See Eastway Construction Corp., supra*, 762 F.2d at 253; *Nemeroff v. Abelson, supra*, 620 F.2d at 348.[30]

---

**29.** *See* note 26 *supra* for text of Section 1927. Section 1927's language has been read in an analogous manner to the "bad faith" standard underlying the court's inherent equitable powers to award fees "[i]n order not to deter an attorney from his ethical duty to 'represent his client zealously.'" *Gianna Enterprises, supra*, 551 F.Supp. at 1359 (quoting *Model Code of Professional Responsibility* EC7–1).

**30.** Under the former Rule 11, "[a]n attorney's certification of a pleading was an assertion that 'to the best of his knowledge, information, and belief, there [was] good ground to support it.'" *Eastway Construction Corp.*, 762 F.2d at 253. The amended version of Rule 11 did not become effective until August 1, 1983. *See* Fed.R.Civ.P. 11. As the Second Circuit noted in *Eastway*, "the language of the [new] rule ... provides a striking contrast to the words of its predeces-

The Court here draws a sharp distinction between the *commencement* of plaintiff's suit against White Stag and its *continuance* of this suit. Although the commencement does not itself entitle White Stag to an award of attorney's fees pursuant to any of the espoused theories, plaintiff's maintenance of this action presents a different conclusion.

▇▇ As previously noted, the old Rule 11 required a showing of bad faith. The amended version of Rule 11, which certainly applies to plaintiff's opposition papers to White Stag's motion,[31] "provides a somewhat more expansive standard for the imposition of attorney's fees" than either the old Rule 11 or the court's inherent equitable powers. *Eastway Construction Corp., supra*, 762 F.2d at 253 (citing *Leema Enterprises, Inc. v. Willi*, 582 F.Supp. 255, 257 (S.D.N.Y.1984)). Under the new Rule 11, an attorney has an affirmative duty to reasonably inquire into the viability of a "pleading, motion or other paper" before it is signed. *See id.* at 253. To put it simply, "subjective good faith no longer provides the safe harbor it once did." *Id.*

▇▇▇ Thus, sanctions under the new Rule 11, are mandatory "against an attorney and/or his client when it appears that a pleading has been interposed for any improper purpose, or *where*, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith extension, modification or reversal of existing law." *Eastway Construction Corp.*, 762 F.2d at 254; *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp, su-*

*pra*, 769 F.2d at 927 n. 2. This standard is not meant "to stifle the enthusiasm ... that is the very lifeblood of the law," but, rather, "to punish ... those who would manipulate the federal court system for ends inimicable to those for which it was created." *Eastway Construction Corp.*, 762 F.2d at 254.

▇▇ In the instant case, plaintiff persisted "in claims or defenses beyond a point where they could no longer be considered to be well-grounded in fact...." Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look*, 104 F.R.D. 187, 189 (1985). Although plaintiff claims White Stag's tardiness in responding to Burlington's interrogatories and document requests as an excuse for its own continual progression on a claim without merit, this court cannot agree. To use plaintiff's own terminology, White Stag had "laid all the cards on the table" at least concurrently with its motion for summary judgment, if not sooner.

Even if plaintiff correctly alleges it first saw Ms. Funderburk's sworn affidavit attached to White Stag's reply papers,[32] plaintiff, at the time it first opposed the motion, had done nothing to get in touch with Ms. Funderburk besides make one unsuccessful phone call. Haigney Supp. Aff. ¶ 39. Neither had plaintiff attempted to depose Mr. Kive Weinstein, the White Stag official who allegedly made an independent decision to terminate Burlington, or any other White Stag representative who was connected with the Belk account. Certainly on the basis of the remaining evidence, at the point where plaintiff opposed White Stag's motion, plaintiff could

---

sor." 762 F.2d at 253. *See infra* for discussion of amended version of Rule 11.

**31.** Burlington filed these papers on April 1, 1985. *See* note 30 *supra.*

**32.** White Stag alleges that it notified plaintiff of Ms. Funderburk's affidavit on or before June 30, 1983. Rhine's Supp. Aff. ¶ 9. On that date, White Stag sent a letter to Burlington confirming an earlier report that Ms. Funderburk's re-

mark had been directly refuted by a sworn affidavit in its possession. *See id.* at Ex. B. Hence, even if Burlington did not *see* the affidavit until May 13, 1985, the date White Stag filed its reply papers, it knew of its existence for almost two years beforehand. Moreover, in plaintiff's memorandum of law, it makes no mention of Ms. Funderburk's remark, indicating its own awareness of the sworn affidavit at least from the time it filed its opposition papers.

hardly say that its allegations were well grounded in fact.[33] Thus, Rule 11 mandates the imposition of sanctions. *See Eastway Construction Corp.*, 762 F.2d at 254 n. 7.[34]

The application for attorney's fees made by defendant White Stag is hereby granted for the period commencing with plaintiff's opposition to White Stag's motion for summary judgment and attorney's fees.[35] Although this Court cannot conclude that plaintiff or its counsel acted in subjective bad faith in bringing this action against White Stag, a competent attorney would have had to reach the conclusion that the claim was destined to fail. See *Eastway Construction Corp.*, 762 F.2d at 254. Accordingly, White Stag is ordered to submit a documentation of its attorneys' fees incurred in defending this action from the prescribed period as well as a proposed order for such fees, within ten (10) days of the date of this decision on five (5) days notice.

---

**33.** *See Viola Sportswear, Inc. v. Mimun*, 574 F.Supp. 619, 621 (E.D.N.Y.1983) (attorney's fees awarded when plaintiff alleged a nationwide conspiracy on the basis of one ten dollar pair of jeans); *see also U.S. ex rel. U.S.-Namibia Trade & Culture Council, Inc. v. Africa Fund*, 588 F.Supp. 1350, 1352 (S.D.N.Y.1984) ("plaintiff's repeated initiation of obviously groundless actions, coupled with the specifics of this action establish[ed] sufficiently an inference of improper purposes for these suits in violation of Rule 11").

**34.** Because Rule 11, as amended, encompasses the situation where claims are rendered untenable by subsequent discovery disclosures, *see*

Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look, supra*, 104 F.R.D. at 189 (1985), this Court need not address the fact that *Nemeroff v. Abelson*, 704 F.2d 652 (2d Cir.1983), would provide it with alternate grounds to grant attorney's fees within its equitable powers for the same prescribed period. *See id.* (where plaintiff's case suffered setbacks that warranted either an accelerated pace of discovery or a discontinuance of the action, neither of which occurred, prevailing defendants were entitled to an award of attorney's fees).

**35.** Thus, White Stag is entitled to attorney's fees for a period commencing on April 1, 1985. *See* text accompanying note 31 *supra*.